### ARGUED AND DETERMINED

##### IN THE

# SUPREME JUDICIAL COURT

##### OF

# MASSACHUSETTS.

---

### CHARLES E. LEWIS, administrator, *vs.* BROTHERHOOD ACCIDENT COMPANY.

Suffolk. December 12, 1905. — January 4, 1907.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, BRALEY, SHELDON, & RUGG, JJ.

*Insurance,* Accident. *Contract,* Validity, Construction. *Arbitrament and Award. Fraternal Beneficiary Corporation. Evidence,* Circumstantial. *Practice, Civil,* Exceptions.

A policy of accident insurance, called a certificate, contained an express promise to pay a certain sum of money to the estate of the insured in case of his death from one of the causes named, and also contained an express promise to pay to the insured in case of injury certain sums varying with the extent of his injury. These promises were made subject to the by-laws of the company and the conditions attached to the policy which were numerous, and neither the by-laws nor the conditions contained any provision for arbitration. At the end of the policy, immediately before the attesting clause, was the following provision : " In the event that this company and the certificate holder or beneficiary disagree as to the liability of this company under this certificate, it is agreed, and this certificate is issued upon the express condition, that such liability and the amount thereof shall be determined by arbitration." Then followed a provision as to the persons of whom the board of arbitrators should consist. *Held,* that the provision quoted was an agreement to refer to arbitration questions of liability arising under other provisions of the contract, and was void as an attempt to oust the courts of their jurisdiction.

In construing doubtful provisions of a policy or certificate of insurance the insured is to be given the benefit of the doubt, and this rule is particularly applicable where the contract of insurance incorporates numerous and complicated conditions.

A policy or certificate of accident insurance was stated to cover drowning as well as bodily injuries produced by external, violent and accidental means, of which many were enumerated. There was also a provision that "In the event of any accidental bodily injury, fatal or non-fatal, contributed to or caused by" a large number of enumerated events, the limit of liability in case of death should be only one twentieth of the death benefit provided for in the policy. The event producing this reduction of liability in case of drowning was described as follows: "drowning or shooting when the facts and circumstances of the accident and injury are not established by the testimony of an actual eye witness; and also when in an alleged drowning (shipwrecks at sea excepted) the body is not recovered and identified;" followed, immediately after the semicolon, by the clause "and in case of injuries whether fatal or disabling of which there is no visible mark on the exterior of the body visible to the eye (the body itself in case of death not to be deemed such mark)." *Held*, that the last quoted provision, referring to external marks of contusions and wounds, applied only to the more violent causes of injury and not to the case of death by drowning; *also*, that the provision in regard to the testimony of an actual eye witness did not require that such eye witness should have seen the drowned person go under water, but that convincing circumstantial evidence of the drowning proved by eye witnesses of the circumstances was sufficient to comply with the requirement. *Whether*, such a requirement is void as an attempt to impose a rule of evidence upon the courts, was not considered.

The rule, that under the statutes relating to fraternal beneficiary corporations a certificate in such a corporation cannot be made payable to the estate of the insured and thus subject a death benefit to the payment of his debts, does not apply to a policy or certificate made payable to the estate of the insured "in trust however for and to be paid over forthwith to his legal heirs," as the real beneficiaries are the heirs at law and the money when recovered goes to them.

A requirement of a policy of accident insurance that in case of the death of the insured by accidental drowning, in order to recover the full amount of the policy, the facts and circumstances of the accident must be established by the testimony of an actual eye witness, is satisfied by evidence from eye witnesses that shortly before the accident the insured, who was a good boatman, was seen on a river with a young woman in a "cranky" canoe, which was likely to overturn at any moment unless unusual care was exercised both by the insured and his companion, and that in less than five minutes from the time at which they last were seen alive the canoe was overturned and their bodies were under water.

The admission of immaterial evidence which could not have harmed the excepting party will not support an exception.

HAMMOND, J. This is an action upon a policy of insurance against accident. The case is before us upon the exceptions taken by the defendant at the trial, in which a verdict for the plaintiff was returned for the full amount claimed.

1. One of the grounds of defence was that there had been no compliance with the arbitration clause. The judge ruled that

the clause was valid, but submitted to the jury the question whether there had been a waiver; and the jury found a waiver. The question upon this branch of the case is whether this action of the judge was prejudicial to the defendant. We have not found it necessary to consider whether there was any evidence of waiver because we are of opinion that the arbitration clause is invalid.

The clause is as follows: "10. In the event that this company and the certificate holder or beneficiary disagree as to the liability of this company under this certificate, it is agreed, and this certificate is issued upon the express condition, that such liability and the amount thereof shall be determined by arbitration; the board of arbitrators to consist of three members of the order of the Odd Fellows, one to be appointed by the company, one by the claimant, and the third shall be the Noble Grand of the lodge of which the assured is a member; and that no legal proceedings for recovery under this certificate shall be brought until the expiration of three months after receipt by the company of acceptable proofs of loss, and of a request in writing, in case of disagreement, to arbitrate, and a refusal by the company to arbitrate; and the company shall not be liable in any legal proceeding unless said proceeding is commenced within six months from the time when the right of action accrues and no suit shall be brought in any case except to enforce payment of the award of said arbitrators unless" the company refuses to arbitrate.

It is to be noted that the subject of reference is not merely the question of damages, or, as put by Colt, J. in *Wood* v. *Humphrey*, 114 Mass. 185, 186, such a matter as does "not go to the root of the action, but . . . [is] . . . only preliminary thereto or in aid thereof — such as respect[s] the mode of settling the amount of damage, or the time of paying it, or the like," but it includes also the question of the "liability of this company under this certificate." To what extent and under what circumstances an agreement to refer a question of liability to arbitration is valid has been the subject of considerable discussion in the courts of England and this country. In England, as stated by W. Allen, J. in *Reed* v. *Washington Ins. Co.* 138 Mass. 572, 576, "The question . . . has been one of the construction of contracts, —

whether the agreement to refer in the particular contract under consideration is a condition precedent to a right of action upon the contract, or an agreement to refer a right arising under other provisions of the contract." See *Scott* v. *Avery*, 8 Exch. 487, 497; 5 H. L. Cas. 811; *Edwards* v. *Aberayron Ins. Society*, 1 Q. B. D. 563; *Spurrier* v. *La Cloche*, [1902] A. C. 446. Perhaps the statement of Maule, J. in *Avery* v. *Scott*, 8 Exch. 497, 499, quoted with approval by Lord Lindley in *Spurrier* v. *La Cloche*, *ubi supra*, contains the principle of the distinction in its most concise form: " There is no decision which prevents two persons from agreeing that a sum of money shall be payable upon a contingency; but they cannot legally agree, that, when it is payable, no action shall be maintained for it." To whatever extent this court would follow the English courts in the first class of cases described by W. Allen, J. as quoted above, namely, those in which the agreement to refer is a condition precedent to the right of action, or, in other words, where the agreement to refer is one of the essential elements of the cause of action, it is certain that in this State, and quite generally in many other jurisdictions, in the second class of cases described, namely, those in which the agreement is to refer a right of action arising under other provisions of the contract, the agreement whether contained in the same or a separate paper is void as an attempt to oust the courts of jurisdiction. *Wood* v. *Humphrey*, 114 Mass. 185, 186. *White* v. *Middlesex Railroad*, 135 Mass. 216. For an extensive collection of the cases see 9 Cyc. 512, note 77.

Upon an inspection of the policy in this case we are of opinion that the clause in question comes under the second class of cases above named, and that it is in substance an agreement to refer a cause of action arising under the other provisions of the contract, and therefore is void as an attempt to oust the courts of their jurisdiction. The first page of the policy contains an express promise to pay a certain sum to the estate of the insured in case of his death from one of the causes named. It also contains an express promise to pay certain sums, varying with the extent of the injury, to the insured. These promises are made subject to the by-laws of the company and the conditions thereto annexed. Neither in the by-laws nor in the conditions annexed is

there any provision for arbitration. We have then an express promise to pay a certain definite sum of money upon compliance with certain expressed conditions. So far the minds of the parties have met. But the conditions are numerous and it was manifest that a disagreement might arise between the insurer and the beneficiary as to whether a particular condition had been complied with ; and the liability of the insurer might turn on that question. There also might arise other disagreements as to the extent of the injuries, for instance whether the injury was such as to bring the case under one promise where a certain sum would be due, or under another promise where only a much smaller sum would be due. With the possibility of the various disputes before them the clause in question is framed by the parties. It comes at the end of a definite contract. It being placed immediately before the attesting clause provides that in the case of a disagreement between the company and the beneficiary " as to the liability of this company under this certificate," the question of " liability and the amount thereof " shall be referred, etc. It is plain that this clause is speaking of a liability on any of the promises thereinbefore set forth. It assumes the existence of a dispute as to whether the conditions under which the express promise to pay is made have been met so that the money is due, or in other words whether the money is due under that express promise. In this very case one of the questions raised — and indeed the principal question — is whether the condition with reference to the testimony of an eye witness as to the facts and circumstances of the accident has been complied with, or, in other words, whether the money is due under the terms of one of the promises. In view of the definite promises contained in the contract, of the express reference to the conditions to which they are subject, and of the situation of the clause in question and of the language of its opening sentence, we are of opinion that the clause cannot be regarded as qualifying the nature of any of the preceding promises, or as an essential element of liability thereon, but that it must stand as an agreement to refer questions of liability arising upon either of the promises. As thus construed the agreement to refer is invalid as an attempt to oust the court of its jurisdiction. The agreement to refer being invalid the whole of the clause is inoperative. See *Baden-*

*feld* v. *Massachusetts Accident Association*, 154 Mass. 77.    Since
the clause is invalid the question of waiver is immaterial; and
the defendant has suffered no injury from the action of the judge
in submitting that question to the jury.

2. It also is contended by the defendant that the policy does
not cover accident by drowning unless as a result of the acci-
dent there are upon the body external marks of contusion or
wounds.    In considering this ground of defence it is to be ob-
served that the provisions of the policy are very voluminous,
elaborate and intricate.    Many of them are printed in very fine
type.    It is the general rule in the construction of an insurance
contract, that any doubt arising upon its face as to its meaning
is to be resolved in favor of the insured.    This rule is founded
in sound sense, and is particularly applicable to a contract so
complicated in detail as the one before us.    Bearing in mind
this rule of construction we proceed to look into this policy.
Upon the first page it is said that the insurance is " against per-
sonal bodily injury leaving upon the body external marks of con-
tusion or wounds."    Upon the second page, under the head of
" What is insured against," it is said that " This certificate
of insurance provides against bodily injuries, such as disloca-
tions, fractures, broken bones, bruises, cuts, accidental gun-shot
wounds, crushing or mangling, burns and scalds, bites of dogs,
stroke of lightning, drowning, or injuries produced by falls,
effected through external, violent and accidental means, within
the intent and meaning of this contract and its conditions as
hereto annexed."    Then follows a statement of the conditions.
The conditions are very complicated and numerous, and are
printed in very fine type.    It is unnecessary to insert them
here.    It is sufficient to say that they provide in substance that
" in the event of any accidental bodily injury, fatal or non-fatal,
contributed to or caused by " any one of a long list of events acci-
dental or otherwise which are detailed at great length, the limit
of liability in case of death shall be only " one-twentieth of the
. . . death benefit provided for in this policy."    The part as to
drowning is in these words: " drowning or shooting when the
facts and circumstances of the accident and injury are not estab-
lished by the testimony of an actual eye witness; and also when
in an alleged drowning (shipwrecks at sea excepted) the body

is not recovered and identified." Then follows a semicolon, followed by these words: " and in case of injuries whether fatal or disabling of which there is no visible mark on the exterior of the body visible to the eye (the body itself in case of death not to be deemed such mark)."

In cases of drowning death is caused by the filling of the lungs with water so that the air cannot get to them, and there is no reason why there should be any external mark of contusion or wound. In the ordinary case, therefore, none is to be expected. And if while drowning the body is bruised, there is usually no natural or necessary connection between such bruise and death. Suppose two persons, each having a policy like this, are accidentally swept overboard from a ship by the same wave. One goes clear and receives no mark, while the other is bruised and scratched by a spike in no way disabling him as he goes over the rail. Both are drowned and both bodies are recovered. Upon the body of the first is found no external mark or contusion or wound, while upon the body of the other appears the work of the spike. Is it to be said that the first case is covered by the policy and the second is not? To hold that drowning is not covered by the policy unless in addition to the flooding of the respiratory organs there is some external mark of contusion or wound is to base a distinction upon a circumstance which generally has nothing whatever to do with the cause of the death, and moreover is to eliminate practically the ordinary and usual case of drowning. An interpretation founded upon such a basis of distinction, and leading to results so unreasonable is not to be adopted unless clearly required by unmistakable language.

In view of these and other obvious considerations the provisions of the policy relating to external marks of contusion and wounds must be held applicable to the more violent causes of injury and not to the case of death by drowning.

3. The policy provides that in case of loss the company shall pay to the estate of the insured " in trust however for and to be paid over forthwith to his legal heirs "; and the defendant contends that the policy could not be made payable to the estate, because, if so made, the sum received would be assets for the payment of debts and expenses of administration and would be subject to an unrestricted disposition by will, which would

be inconsistent with the statutes. But this is not a case where the estate is the beneficiary, as was *Daniels* v. *Pratt*, 143 Mass. 216, upon which and other similar cases the defendant relies. By the express provision of the policy the administrator receives the money solely in trust for the heirs at law and is answerable for it to no one else. In substance, then, the real beneficiaries are the heirs at law. The money when recovered goes to them and there is no violation of the statutes. See *Rindge* v. *New England Aid Society*, 146 Mass. 286 ; *Shea* v. *Massachusetts Benefit Association*, 160 Mass. 289; *Sargent* v. *Sargent*, 168 Mass. 420, and cases cited.

4. The difficult question in the case is one of damages. Shall the plaintiff recover the full sum of $5,000, or only one twentieth of that sum, to wit, $250 ? The answer turns upon the meaning of the clause in the policy respecting eye witnesses. This clause is found among the large amount of fine print upon the second page of the policy under the head of " Conditions," and, so far as material to the question before us, is as follows : " In the event of any accidental bodily injury, fatal or non-fatal, contributed to or caused by . . . drowning or shooting when the facts and circumstances of the accident and injury are not established by the testimony of an actual eye witness, . . . then and in every such case the limit of the liability of this company hereunder shall be one-twentieth of the accidental death benefit provided for in this policy not to exceed two hundred and fifty dollars for accidental death, and for non-fatal injuries causing total or partial disability, one-fifth of the weekly indemnity provided for in this policy." This whole paragraph of which the above is a part describes more than two dozen cases in either one of which the same reduction to one twentieth is to be made. Although the case before us is one of drowning, still upon the question of interpretation the fact that the clause includes also injury or death by shooting may be properly considered.

The clause seems to be of somewhat recent origin in policies of insurance, and our attention has not been called by counsel to any case, nor are we aware of any except *National Accident Society* v. *Ralstin*, 101 Ill. App. 192, in which it has received judicial attention. That case was one of shooting and the injury was not fatal. It was held that the plaintiff, who was the

injured person, was an eye witness to his own injury. It was further said that an eye witness to a shooting does not necessarily mean one who saw the load leave the gun.

Before the insertion of this clause the insurance companies labored under some difficulty in their defence. Especially was this felt in cases of death by drowning or shooting. If the defence was that the death was suicidal, inasmuch as suicide was not to be presumed, the burden of showing suicide was upon the defendant; and where the facts and circumstances of the accident were shown only by circumstantial evidence there frequently would be great difficulty in sustaining this burden even if death actually was suicidal. Moreover, in the case of disappearance of the person whose life was insured, and the subsequent finding of the dead body in the water, the question whether death was caused by drowning or by some disease or cause not insured against was frequently embarrassing to the defence. A good illustration of such a case is *Trew* v. *Railway Passengers' Assurance Co.* 6 H. & N. 838. In that case it appeared that the assured left his lodgings for the purpose of bathing, and was not afterwards seen alive. Subsequently his clothes were found by the water side. A body was found in the water at a distance from the place where he went to bathe, but not at such a distance that it might not have been carried there by the waves, and there was some evidence that this was the body of the assured. It was held that, assuming that the body was that of the assured, it was a question for the jury whether the death was by drowning or by suicide or natural causes, such as apoplexy or heart disease or the like. In an attempt to meet such cases doubtless, a clause has been inserted in policies providing in substance that there shall be no recovery in certain cases unless the claimant proves by direct and positive proof that the death or injury was caused by accident and was not the result of design, or in other words was from a cause covered by the policy. But it was held that such a clause did not make it necessary that the facts and circumstances of the injury should be shown by persons who were actually present when the insured received the injuries, but that it was sufficient if they were shown by circumstantial evidence. *Travellers' Ins. Co.* v. *McConkey*, 127 U. S. 661. *Utter* v. *Travelers' Ins. Co.* 65 Mich. 545.

It would seem as if the clause under consideration was inserted in view of these and other similar decisions. It is not to be disposed of by the remark that it is in fine print, or is in the nature of a trap or catch and hence is to be wholly disregarded. It forms a part of the contract and must be fairly construed. What does the clause mean? An eye witness is a person who testifies to what he has seen. By the terms of this policy the facts and circumstances of the accident and injury are to be established by those who saw them. Not only are the facts and circumstances of the injury to be established by an eye witness, but also those of the accident, that is, the operating cause of the injury. Enough must be testified to by eye witnesses to show the operating cause of the injury, or at least to show that at the time of the injury there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working. To illustrate: Suppose a person standing upon the shore sees not far out a boat sailing peacefully along in a mild breeze, with a competent and careful man at the helm. The boat is so large and steady that it is not likely to be capsized by any movement the man would make, nor by the wind as then blowing. In no sense can the boat be said to be in then present peril from any cause. Suppose the observer leaves the shore and returns in an hour, and then sees the upturned boat near where he first saw it. During his absence an accident has happened resulting in the upsetting of the boat. Can it be said that he has seen the circumstances of the accident within any fair interpretation of the language? He has seen no cause in operation to which the accident may be fairly attributed. But suppose that when he first sees the boat, or while he is looking at it, a squall suddenly looms up in the distance and rapidly approaches the boat. He sees it strike the boat, putting her in evident peril. Wanting to get a better look he runs to a house for a spy glass, is gone only a few minutes, and when he returns sees only a capsized boat. Such a man is an eye witness of the accident, although he did not actually see the boat capsize. He saw the boat in peril from a then impending cause. He saw the cause at work and he saw what was the natural effect of such a cause. That is far

enough ; and in such a case the cause of the accident must be held to have been established by an eye witness within the meaning of the policy.

In the light of this interpretation of the clause we proceed to examine the evidence in this case to see to what extent the facts and circumstances of the accident and the injury are shown.   One Black testified that about five minutes before four o'clock in the afternoon of June 25, 1902, he, being out on the river in a skiff with one Reissman, saw Lewis in a red canoe with a lady, going " in the opposite direction from the way the witness was going.  Lewis was paddling the canoe sitting in the stern, and Miss Hurley was sitting in the centre of the canoe on the bottom, leaning back against the cushions.  The pair were talking, and Lewis smiled and bowed to witness." The witness had known Lewis very well for two years.  " Lewis looked bright and happy ; . . . the pair were chatting together ; . . . Miss Hurley appeared the same as any young woman on the river ; and . . . there was nothing unusual in the appearance of either ; . . . they were going quite swift and . . . Lewis was a good hand on the river."  He " had his coat and vest off." Reissman, who was with Black, testified substantially to the same facts.  He further said that about three or four minutes after they had passed the couple, and after a point of land had shut the canoe out of sight, he heard a scream, but could not swear whether it was the scream of a man or a woman ; that it did not seem to him at the time to be a cry of agony ; that it seemed like a cry of despair, but that he did not go back, and never thought any more of it until the next day when he heard of the accident.  So far as appears this was the last time that either Lewis or Miss Hurley was seen alive.

One Chellman testified that he was out on the river that afternoon, but did not know Lewis ; that shortly before four o'clock the witness and a man named Esselen " were coming up the river and found the overturned canoe ; that they were paddling and had been picking pond lilies ; that as they came around the bend he discovered the cushions and the lady's coat, gentleman's coat and lady's hat, and a red canoe, bottom up ; that the carpet was with the canoe with one end thrown over the bottom, and after paddling around they found a gentleman's vest five feet

under water; that he fished it out, that it was not on the bottom; that he looked at the watch and that it was stopped at four o'clock; that the vest was soaked through, but that the other things had not sunk below the surface; that these things were found not later than quarter past four; that they picked up the things," and towed the boat to the Hiatt boat house. On cross-examination he appeared a little uncertain as to the precise time, but placed the time as near four o'clock. He also said that the canoe was about twenty feet from the shore. He was corroborated by Esselen, who fixed the time of picking up the things as " within ten or fifteen minutes past four."

The next day the bodies of Lewis and Miss Hurley were taken from the river near the place of the accident, and there was no question about identification. There were no external marks upon the body of Lewis, and the medical examiner testified that death was caused by drowning, and that in his opinion it was a case of accidental drowning. Hiatt, the owner of the canoe, testified that Lewis hired the canoe about two o'clock; that he " seemed natural "; and that " he was a very good boatman and had been coming constantly to his boathouse for two seasons." As to the canoe he testified that it was a " sixteen foot canoe of thirty-four or thirty-five inch beam, made of cedar with a canvas skin and painted red "; that it " was what he should call a medium safe canoe, that a person would have to be more careful with it than with a larger one." On cross-examination he testified that there " was no reason for his [Lewis's] upsetting in a medium safe canoe; . . . that he was a perfectly competent man and had a perfectly safe canoe."

It is unnecessary to recite the evidence further in detail. The jury might have found on the evidence of actual eye witnesses that shortly before the time when the accident happened Lewis and Miss Hurley were upon the river in what might be called a " cranky " canoe, liable to overturn at any moment unless unusual care was exercised both by Lewis and his companion; that within five (perhaps fewer) minutes of the time at which they were last seen alive the canoe was overturned and the bodies were under water. Here then is shown upon the testimony of eye witnesses an operating cause, — namely, the imminent liability of the capsizing of the boat by reason of its

cranky nature, taken in connection with the fact that it had two occupants of whom one was a young woman not shown to have been experienced in aiding to keep the canoe in balance. It is not the case of a boat which is of such size and construction as to be not liable to be upset by the movements of persons in it, but it is the case of a cranky canoe having two persons in it where a not unusual movement, even of one of them, may result in the capsizing of it. An operating cause for disaster is ever present under such circumstances, and that cause is disclosed by the testimony of eye witnesses. Moreover, upon the evidence the jury might have found that the movements of the canoe and its occupants were shown by eye witnesses up to a time within three or four minutes of the accident, and that every operating cause of the accident except the one above shown to have been present was fairly excluded by the testimony of these same eye witnesses. It must be held that in the case before us the facts and circumstances of the accident and injury were established by eye witnesses within the meaning of the policy. We see no substantial error in the manner in which the trial judge dealt with this branch of the case.

In view of our decision upon this point it becomes unnecessary to consider the contention of the plaintiff that such a provision is void upon the ground that it is an attempt to dictate to a court as to rules of evidence.

5. Under the circumstances disclosed in this case we do not see how it was material whether the defendant is a fraternal beneficiary association or not. The action is upon the policy. The exceptions to the admission of the evidence are also overruled. Even if the evidence excepted to was immaterial, as contended by the defendant, we do not see how the defendant could have been harmed by its admission.

*Exceptions overruled.*

The case was argued at the bar in December, 1905, before *Knowlton,* C. J., *Morton, Hammond, Loring & Sheldon,* JJ., and afterwards was submitted on briefs to all the justices.

*H. W. Ogden,* (*J. B. Crawford* with him,) for the defendant.

*W. M. Noble,* (*H. R. Morse* with him,) for the plaintiff.